JUDGE HELLERSTEIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

08 CV 6939

---------------------------------------------------------------X

TARYN A. HARRIS,

Plaintiff,

-against-

DEPARTMENT OF HEALTH AND MENTAL HYGIENE, OFFICE OF THE CHIEF MEDICAL EXAMINER,

Defendant.

---------------------------------------------------------------X

Civil Action No.

COMPLAINT
(Jury Trial Demanded)

COMES NOW, Plaintiff Taryn A. Harris ("Harris" or "Plaintiff") by and through her undersigned attorneys, The Law Offices of Neal Brickman, P.C., as and for her Complaint against Defendant, the New York City Department of Health and Mental Hygiene, Office of the Chief Medical Examiner ("OCME" or "Defendant"), and states and alleges the following:

## NATURE OF THE CASE

Plaintiff, who suffers from a chronic and painful illness, Reflex Sympathetic Dystrophy Syndrome, brings this action alleging the OCME's violation of the Americans with Disabilities Act, 42 U.S.C. 12101, et seq. ("ADA"), Title 8 of the Administrative Code of the City of New York, and New York State Human Rights Law, based upon the OCME's deliberate discrimination against Plaintiff as a direct result of her illness and disability.

## THE PARTIES

1. Taryn Adrienne Harris is an individual who resides in the State of New York, County of New York.

2. The Department of Health and Mental Hygiene Office of the Chief Medical Examiner operates in the State and City of New York and is located at 520 First Avenue, New

York, New York 10016.

## JURISDICTION AND VENUE

3. This Court has jurisdiction pursuant to 28 U.S.C. §1332, to the extent that Plaintiff brings this action pursuant to federal law, and this Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367, to the extent that Plaintiff brings related state law claims under the laws of the State of New York. Venue is proper in the Southern District of New York because the facts and circumstances giving rise to the instant Complaint took place within this District.

4. On or about July 20, 2007, Plaintiff properly filed a timely charge with the U.S. Equal Employment Opportunity Commission and/or New York City Commission on Human Rights by filing and serving a Verified Complaint, Federal Charge No. 16F-2007-00131C, Complaint No. M-E-D-07-1019334-D. Ms. Harris has since received a Dismissal and Notice of Rights, dated May 8, 2008. This action is being timely commenced within ninety (90) days of that Notice of Rights and within the applicable statute of limitations.

## STATEMENT OF FACTS

5. Ms. Harris interviewed for a position as a level one Medicolegal Investigator ("MLI") at the New York City Department of Health, Office of the Chief Medical Examiner in January of 2005. A level one MLI at the OCME investigates the deaths reported to the OCME in order to obtain a factual history and record of events, including the manner and circumstance of death.

6. A level one MLI at the OCME works both in the office and in the field. In the office, a MLI level one employee typically maintains records, interfaces with the New York Police Department and health care providers, prepares reports, identifies the body through

various databases or medical records, and provides information related to the death to the appropriate agencies or family members. In the field, a MLI level one employee typically observes the scene, interviews witnesses, documents and removes evidence, investigates the death for the death certificate, oversees the transportation of the body and, if needed, conducts follow-up investigations or interviews.

7. A MLI employee at OCME may work an entire day or multiple days in the office, or in the field, or a combination of both.

8. Ms. Harris was hired shortly after her interview upon completion of a pre-hire medical examination. As part of the interview process, Ms. Harris was required to undergo a complete physical exam in January 2005, conducted at the behest of the OCME through its selected physician, Dr. Gehl, after which Ms. Harris was approved for hire. Ms. Harris was both fit and able to perform the job and all duties related thereto at the time she started working at the OCME.

9. Ms. Harris explained at the time of her interview in January 2005, by way of background only, that she was a retired police officer.

10. Ms. Harris retired from the police force in 1992 because of a neck injury sustained from an on-the-job assault.

11. After leaving the police force, Ms. Harris later returned to school to train as a physician's assistant.

12. In large part because of Ms. Harris's background as a retired police officer, she was considered an ideal candidate for joining the OCME as a MLI. Her old injury from 1992 had no impact on Ms. Harris's ability to perform as a MLI at the OCME in 2005. The job tasks for a

level one MLI were thoroughly discussed during the interview, and Ms. Harris underwent a full physical examination specifically to evaluate her physical ability to perform the job. At the examination her old injury and her range of motion were explicitly addressed.

13.   Ms. Harris started on the job as a level one MLI in March 2005; she performed exceptionally well, worked hard, and was often selected for overtime and/or to fill open shifts particularly after the unexpected departure of Eric Speigel.

14.   Unexpectedly and unrelated to her work at the OCME, on or about July 20, 2005, Ms. Harris was a passenger in a car that was rear-ended. Ms. Harris promptly reported this accident and her injury to the OCME.

15.   Ms. Harris's injuries as a result of the accident were severe and it is now known that these injuries ignited Ms. Harris's Reflex Sympathetic Dystrophy Syndrome (RSD) illness. As a result of the 2005 accident, Ms. Harris sustained multiple injuries for which she sought medical treatment, and she began to suffer severe and debilitating pain.

16.   RSD, also referred to as Complex Regional Pain Syndrome, is a chronic pain condition and neurological disorder that involves continuous, intense pain which is disproportionate to the severity of the injury or circumstance, that gets progressively worse rather than better over time. Typical features include intense burning pain, skin sensitivity, skin discoloration, sweating and swelling. RSD impacts multiple systems of the body, including different extremities, individually and collectively.

17.   Because of the unusual nature of RSD, for many months the scope of Ms. Harris's injuries after the car accident was unclear, although the individual symptoms of pain she exhibited were physically manifested, detected and well documented. For a short period of time

– approximately one month – Ms. Harris continued to work at the OCME in between appointments and medical care. In September 2005, however, Ms. Harris went on full time medical leave (without pay) to treat her condition.

18. Barbara Kelly of the OCME specifically informed Ms. Harris that she had a year to return to the OCME as a MLI, upon taking medical leave. Her last day of work at the OCME was September 15, 2005, her leave started on September 16, 2005. Her initial leave of absence was approved by the OCME as was each subsequent request up to a year of leave (i.e. up to and through September 15, 2006). Ms. Harris kept in touch with Ms. Kelly as to her doctor's appointments, treatment and progress while away from the OCME.

19. It was a matter of months before the proper diagnosis was reached in 2005. During this time frame, Ms. Harris endured excruciating pain which limited the majority of all of her major life activities, while her doctors underwent the painstaking trial and error process of treating various symptoms in an effort to diagnosis the illness.

20. Once the proper diagnosis was reached – months later – Ms. Harris began receiving treatment for her illness and started rehabilitation. As a result of the treatment she has been able to regain her life, diffuse the pain and manage the illness.

21. RSD is typically a chronic illness from which Ms. Harris will likely suffer for the rest of her life. With proper medication, therapy and physical rehabilitation, however, Ms. Harris is now, thankfully, able to go about her life.

22. During Ms. Harris's time away from the OCME while on medical leave, she remained in frequent contact with the OCME regarding her diagnosis, treatment, prognosis and desire to eventually return to work. At all times, she was told that she was entitled to a full year

of medical leave, if necessary.

23. In early September 2006, Ms. Harris was ready and able to return to work, having made significant headway in managing her illness and resuming her life. Ms. Harris contacted Ms. Kelly to discuss her return to the OCME.

24. At this point in time, Ms. Harris was able to sit, stand, move around and otherwise handle her daily tasks. Her treating physician made a determination that Ms. Harris was fit and able to return to work with a reasonable accommodation and prepared a note to this effect. Her conversations with Ms. Kelly and her submission of the note from her doctor took place before the a year had lapsed since the start of her medical leave.

25. The accommodation sought related to heavy lifting in connection with the moving and turning of bodies for up to three months of time following her return to work. Notably, heavy lifting in connection with lifting a body while investigating a scene is not required in every instance and represents only one of fourteen job duties assigned to a MLI level one investigator. In some instances, an investigation may require that a body be moved before it is otherwise transported in order to obtain evidence or further information regarding the cause of death. Upon information and belief, a MLI is allowed to examine a body once the body is already moved from location but before its autopsy in cases where the position, weight or decomposition, of the body makes an on-scene examination impractical.

26. Other MLI employees at the OCME have received a similar accommodation following a medical leave of absence, including being assigned to primarily "desk duty" for a period of weeks and/or months.

27. Ms. Harris spoke with Barbara Kelly at the OCME about what needed to be

submitted in order to return, and thereafter carefully followed her instructions. In conjunction with Ms. Harris's calls to Barbara Kelly arranging for her return to work, Ms. Harris's doctor submitted a note, dated September 14, 2006, directly to the OCME on September 15, 2006. Ms. Harris was told by Ms. Kelly that Ms. Kelly was expecting the note from Ms. Harris' doctor.

28. When Ms. Harris did not hear any response from Ms. Kelly with regard to her doctor's note sent on September 15, 2006, Ms. Harris called Ms. Kelly and spoke with her on or about September 19, 2006, in follow-up to see if there was anything else that needed to be done. At that time, Ms. Harris was told to resend the note, which she had her doctor do on September 20, 2006. At no time was Ms. Harris told that the note was insufficient, needed more detail or that it was unclear whether she intended to return to work. Ms. Harris sought to return to work before the year of medical leave ended.

29. Ms. Harris properly contacted the OCME with her intent to return to work within the one year time period allowed and within the one year time period of which Ms. Kelly advised Ms. Harris.

30. In September 2006, Ms. Kelly told Ms. Harris that the OCME would contact her to schedule a medical examination similar to the one that she underwent when initially applying for the job, prior to Ms. Harris's return to work. Ms. Harris waited to be contacted, but no such examination was ever scheduled.

31. Much to her surprise and in complete contrast to Ms. Kelly's statements, on or about September 22, 2006, Ms. Harris was informed that she was being terminated for incompetence (i.e. inability to perform the job) based upon her medical condition.

32. Her request for an accommodation was not even considered by the OCME.

Moreover, despite her willingness to return to work and her qualifications to perform the job, Ms. Harris was not reinstated.

33. Ms. Harris grieved the OCME's decision through her union which represented her, under the applicable contract, at an informal (Step I) hearing, Step II hearing and Step III hearing. Further details of the proposed accommodation were spelled out by Ms. Harris's doctor in a January 2007 letter (prepared for the Step I hearing in response to a request for same) during the grievance proceedings. Ms. Harris, however, was not reinstated – with or without an accommodation – and was terminated, effective March 29, 2007.

34. On or about July 20, 2007, Ms. Harris filed a Verified Complaint with the New York City Commission of Human Rights based upon the OCME's violation of the Americans with Disabilities Act, New York Human Rights Law, and the New York City Administrative Code.

**AS AND FOR THE FIRST CLAIM AGAINST THE OCME**
**(Violation of the Americans with Disabilities Act)**

35. Plaintiff repeats, reiterates and re-alleges each and every allegation set forth in paragraphs "1" through "34" of this Complaint with the same force and effect as if fully set forth herein at length.

36. Under the Americans with Disabilities Act, 42 USC §12101, et seq. ("ADA") a qualified person with a disability is defined as an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. 42 USC §12111(8).

37. An employer governed by the ADA means a person engaged in an industry

affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year. 42 USC §12111(5)(a).

38. A reasonable accommodation includes (a) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (b) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities. 42 USC §12111(9).

39. As set forth in section 12112(a), no employer shall discriminate against a qualified individual with a disability because of the disability of such individual with regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

40. Prohibited discrimination under the ADA includes not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an employee. 42 USC §12112(b)(5)(A).

41. An employer is required to provide a reasonable accommodation to a disabled person when that individual, "with or without reasonable accommodation, can perform the essential functions of the position" and the accommodation requested does not impose an undue hardship on the operation of the employer. 42 USC §12112(b)(5)(A).

42. As set forth in 29 C.F.R. §1630.2(g), a disability means a physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment.

43. A physical or mental impairment is defined as (1) any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin and endocrine; or (2) any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities. 29 CFR §1630.2(h).

44. Major life activities include functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working. 29 CFR §1630.2(i).

45. As a result of suffering from RSD, Ms. Harris is disabled and a qualified person with a disability under the ADA. Without medication and her pain management program, Ms. Harris would experience excruciating pain that would render her unable to perform even the most simple major life activities.

46. RSD is a physiological disorder that affects *inter alia* Ms. Harris's neurological system. Ms. Harris has a demonstrable record of this medical impairment.

47. With the treatment that she has been receiving, Ms. Harris is capable of performing all of the essential functions related to the level one MLI position at the OCME.

48. With or without an accommodation, Ms. Harris could, and can, perform the essential functions of her position as a level one MLI.

49. Ms. Harris provided the OCME with notice of her request for a reasonable accommodation in September 2006 including, but not limited to, her communications with Ms. Kelly on or about September 14, 2006 and September 19, 2006, and as further by and through her

doctor's note regarding her ability to return to work.

50. Ms. Harris's sought a limited job restructuring and/or modified work schedule for a brief period of time up to three months wherein she would work only eight hour shifts and receive assistance, if needed, during this time period should an occasion arise involving the lifting of a body.

51. Ms. Harris's request for only eight hour shifts constitutes a reasonable accommodation and does not require significant difficulty or expense to meet such that it would impose an undue hardship upon the OCME.

52. Ms. Harris's request for assistance in the event of heavy lifting, such as lifting a body, rather than any one extremity, constitutes a reasonable accommodation and does not require significant difficulty or expense to meet such that it would impose an undue hardship upon the OCME.

53. Ms. Harris was terminated from her position as a level one MLI because she suffers from RSD. The OCME engaged in intentional discrimination with notice and/or reckless indifference to Ms. Harris's federally protected rights as a qualified person with a disability.

54. At all times, Ms. Harris was, and is, ready, willing, fit and able to return to work and perform all job duties and functions of her position as a level one MLI. Ms. Harris made a reasonable request for an accommodation.

55. The OCME denied Ms. Harris's request for a reasonable accommodation. After denying Ms. Harris's request for an accommodation, the OCME still did not allow Ms. Harris to return to work.

56. Upon information and belief, other MLI employees have received

accommodations as to job restructuring and/or a modified work schedule including, but not limited to, assignment to desk duty or non-field work for a period of weeks and/or months. Upon information and belief, Sal DiMeglio, employed by the OCME as a MLI, received approximately five weeks of desk duty and Marie DiChiaro, employed by the OCME as a MLI, received approximately two months of desk duty.

57. The OCME discriminated against Ms. Harris on the basis of her disability in violation of the ADA when it refused to provide a reasonable accommodation to Ms. Harris.

58. The OCME discriminated against Ms. Harris on the basis of her disability in violation of the ADA when it treated Ms. Harris differently, and less favorably, than other similarly situated individuals in like circumstances.

59. The OCME discriminated against Ms. Harris on the basis of her disability in violation of the ADA when it terminated her employment.

60. As a direct and proximate cause of the OCME's actions, Ms. Harris has suffered injury, harm and damages including, but not limited to, lost wages, benefits, and compensation.

**WHEREFORE**, Ms. Harris respectfully demands judgment against the OCME for: compensatory damages, plus pre-judgment interest as to any back pay awarded, accruing from the date of her termination, in an amount to be determined at trial, but in no event less than Two Hundred Fifty Thousand Dollars ($250,000.00); punitive damages in an amount to be determined at trial, but in no event less than Five Hundred Thousand Dollars ($500,000.00); and any such other and further relief as this Court deems just, fair, and proper.

**AS AND FOR THE SECOND CLAIM AGAINST THE OCME**
**(Violation of the New York Executive Law §296)**

61. Plaintiff repeats, reiterates and re-alleges each and every allegation set forth in paragraphs "1" through "60" of this Complaint with the same force and effect as if fully set forth herein at length.

62. The OCME operates in the City and State of New York, and all acts alleged herein took place within the City and State of New York.

63. As set forth in section 300 of the New York Executive Law ("Human Rights Law"), the Human Rights Law is to be liberally construed.

64. Section 296 of the Human Rights Law defines and prohibits unlawful discriminatory practices. It is unlawful for an employer, because of an individual's disability, to discharge him or her from employment or discriminate against that individual.

65. Disability, as set forth in section 292(21) of the Human Rights Law, is defined as 1) a physical, mental or genetic medical impairment resulting from anatomical, physiological, or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques; or (2) a record of such impairment; or (3) a condition regarded by others as such an impairment.

66. Ms. Harris qualifies as a person with a disability under the Human Rights law. RSD is a physiological and/or neurological condition which dramatically prevents the exercise of normal bodily function. Ms. Harris has a demonstrable record of this medical impairment.

67. Ms. Harris provided the OCME with notice of her disability at multiple times in the summer of 2006 and specifically in September 2006.

68. The OCME qualifies as an employer to which the Human Rights Law applies as set forth in section 292(5) as it employs more than four individuals.

69. Section 292(21)(e) of the Human Rights Law defines a reasonable accommodation as actions taken which permit an employee with a disability to perform in a reasonable manner the activities involved in the job, including job restructuring and modified work schedules.

70. Ms. Harris provided the OCME with notice of her request for a reasonable accommodation in September 2006 including, but not limited to, her communications with Ms. Kelly on or about September 14, 2006 and September 19, 2006, and as further by and through her doctor's notice regarding her ability to return to work.

71. Ms. Harris sought a limited job restructuring and/or modified work schedule for a brief period of time wherein primarily she would work only eight hour shifts and receive assistance, if needed, during this time period should an occasion arise involving the lifting of a body.

72. Ms. Harris's request for only eight hour shifts for a short period of time constitutes a reasonable accommodation and does not impose an undue hardship upon the OCME.

73. Ms. Harris's request for assistance in the event that heavy lifting, such as lifting a body, was required during the short period of time constitutes a reasonable accommodation and does not impose an undue hardship upon the OCME.

74. Ms. Harris suffers from RSD, which does not prevent her from performing in a reasonable manner the activities involved in her job as a level one MLI. With or without an accommodation, Ms. Harris could perform the essential functions of her position as a level one MLI.

75. Ms. Harris was terminated from her position as a level one MLI because she suffers from RSD. The OCME acted knowingly and intentionally with malice and/or in reckless disregard to Ms. Harris's rights under the laws of the State of New York.

76. The OCME terminated Ms. Harris purportedly for "incompetence" as in her ability to perform as a direct result of her illness.

77. At all times, Ms. Harris was, and is, ready, willing, fit and able to return to work and perform all job duties and functions. Ms. Harris made a reasonable request for an accommodation.

78. The OCME denied Ms. Harris's request for a reasonable accommodation. After denying Ms. Harris's request for an accommodation, the OCME still did not allow Ms. Harris to return to work.

79. Upon information and belief, other MLI employees have received accommodations as to job restructuring and/or a modified work schedule including, but not limited to, assignment MLI employees to desk duty or non-field work for a period of weeks and/or months. Upon information and belief, Sal DiMeglio, employed by the OCME as a MLI, received approximately five weeks of desk duty and Marie DiChiaro, employed by the OCME as a MLI, received approximately two months of desk duty.

80. In a humiliating fashion intentionally designed to cause Ms. Harris mental anguish and suffering, the OCME, without basis or justification, accused Ms. Harris of "faking" her illness and trying to "cheat" or "scam" the system.

81. The OCME discriminated against Ms. Harris on the basis of her disability in violation of the Human Rights Law when it refused to provide a reasonable accommodation to

Ms. Harris.

82. The OCME discriminated against Ms. Harris on the basis of her disability in violation of the Human Rights Law when it treated Ms. Harris differently, and less favorably, than other similarly situated individuals in like circumstances.

83. The OCME discriminated against Ms. Harris on the basis of her disability in violation of the Human Rights Law when it terminated her employment.

84. As a direct and proximate cause of the OCME's actions, Ms. Harris has suffered injury, harm and damages including, but not limited to, lost wages, benefits, and compensation, as well as humiliation, depression and mental anguish.

**WHEREFORE**, Ms. Harris respectfully demands judgment against the OCME for: compensatory damages, plus pre-judgment interest as to any back pay awarded, accruing from the date of her termination, in an amount to be determined at trial, but in no event less than Two Hundred Fifty Thousand Dollars ($250,000.00), and any such other and further relief as this Court deems just, fair, and proper.

**AS AND FOR THE THIRD CLAIM AGAINST THE OCME**
**(Violation of the NYC Administrative Code)**

85. Plaintiff repeats, reiterates and re-alleges each and every allegation set forth in paragraphs "1" through "84" of this Complaint with the same force and effect as if fully set forth herein at length.

86. Title 8, section 107, of the Administrative Code of the City of New York expressly provides that "[i]t shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national

origin, gender, disability, marital status, partnership status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." New York City Administrative Code §8-107(1)(a).

87. As set forth in section 8-102(16)(a) of the New York City Administrative Code, disability is defined as any physical, medical, mental or psychological impairment, or a history or record of such impairment.

88. Section 8-102(16)(b) clarifies that the term "physical, medical, mental or psychological impairment" means (1) an impairment of any system of the body; including, but not limited to: the neurological system, the musculoskeletal system; the special sense organs and respiratory organs, including, but not limited to, speech organs; the cardiovascular system; the reproductive system; the digestive and genito-urinary systems; the hemic and lymphatic systems; the immunological systems; the skin; and the endocrine system; or (2) a mental or psychological impairment.

89. Title 8 of the Administrative Code of the City of New York also provides that "any person prohibited by the provisions of this section from discriminating on the basis of disability shall make reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job or enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." New York City Administrative Code §8-107(15)(a).

90. The OCME qualifies as an employer under section 8-102(5) because it employs more than four individuals.

91.  RSD qualifies as disability under section 8-102(16)(b) of the New York City Administrative Code. Ms. Harris is a person with a disability under the New York City Administrative Code.

92.  The OCME was made aware and knew of Ms. Harris's disability. The OCME acted knowingly and intentionally with malice and/or in reckless disregard to Ms. Harris's rights under the laws of the City of New York.

93.  Ms. Harris sought a reasonable accommodation to help facilitate her return to work by limiting the length of her work day to an eight hour shift for a short period of time of one to three months upon her return to work; and by receiving assistance in the event of heavy lifting, if Ms. Harris needed to lift a body during this short one to three month period of time.

94.  With or without the reasonable accommodation requested, Ms. Harris could, and can, satisfy the essential requisites of her position as a level one MLI.

95.  The OCME discriminated against Ms. Harris on the basis of her disability in violation of the New York City Administrative Code when it refused to provide a reasonable accommodation to Ms. Harris.

96.  The OCME discriminated against Ms. Harris on the basis of her disability in violation of the New York City Administrative Code when it treated Ms. Harris differently, and less favorably, than other similarly situated individuals in like circumstances.

97.  The OCME discriminated against Ms. Harris on the basis of her disability in violation of the New York City Administrative Code when it terminated her employment.

98.  As a direct and proximate cause of the OCME's actions, Ms. Harris has suffered injury, harm and damages including, but not limited to, lost wages, benefits, and compensation.

**WHEREFORE**, Ms. Harris respectfully demands judgment against the OCME for: compensatory damages, plus pre-judgment interest as to any back pay awarded, accruing from the date of her termination, in an amount to be determined at trial, but in no event less than Two Hundred Fifty Thousand Dollars ($250,000.00); an award of punitive damages in an amount to be determined at trial, but in no event less than Five Hundred Thousand Dollars ($500,000.00); an award of her fees and costs including, but not limited to, her attorneys' fees, incurred to date; and any such other and further relief as this Court deems just, fair, and proper.

**JURY DEMAND**

99. Ms. Harris hereby demands a trial by jury as to all claims set forth herein.

Dated: New York, New York
August ~~July~~ 4, 2008

The Law Offices of Neal Brickman, P.C.
*Attorneys for Plaintiff Taryn A. Harris*

By: [signature]

Neal Brickman (NB 0874)
317 Madison Avenue, 21st Floor
New York, New York 10017
T: (212) 986-6840
F: (212) 986-7691
Neal@brickmanlaw.com